542 A.2d 1267

Michael Wardell STANLEY

v.

STATE of Maryland.

Clarence Haywood TRICE a/k/a Benjamin Edward Chester

v.

STATE of Maryland.

Nos. 82, 107, Sept. Term, 1987.

Court of Appeals of Maryland.

July 1, 1988.

Michael R. Braudes, Asst. Public Defender (Alan H. Murrell, Public Defender, on the brief), Baltimore, for Stanley.

John L. Kopolow, Asst. Public Defender (Alan H. Murrell, Public Defender, on the brief), Baltimore, for Trice.

Gary E. Bair, Richard B. Rosenblatt, Asst. Attys. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for the State.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

ADKINS, Judge.

In this opinion we shall consider the cases of petitioner Michael Wardell Stanley (Stanley) and of appellant Clarence Haywood Trice a/k/a Benjamin Edward Chester (Trice). Both are members of the black race. Each was convicted at trial by substantially or totally white juries after most or all potential jurors who were black were excluded from jury service by peremptory challenges used by a State prosecutor. The two cases thus present a common question: did the procedures used by the State violate the prohibition

against racially discriminatory jury selection explained in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).[1]

Based on the evidence concerning the prosecutors' exercise of peremptory challenges, we shall hold that in each case a prima facie showing of purposeful discrimination in the selection of the petit jury was made. We shall invoke Md.Rule 871 to remand each case for further proceedings, the nature of which we shall describe in due course. Due to factual variations between the *Trice* and *Stanley* cases, we must discuss the issues somewhat differently in each. But first we set the constitutional scene.

## I. BATSON V. KENTUCKY—ITS GENESIS AND SCOPE

### A. *Batson v. Kentucky and the Exercise of Peremptory Challenges*

On 30 April 1986 the United States Supreme Court decided *Batson v. Kentucky,* in which the Court announced a new rule concerning the exercise of peremptory challenges in jury trials. That rule, as developed by the Court, follows from the conclusion "that a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." 476 U.S. at 96, 106 S.Ct. at 1722–1723, 90 L.Ed.2d at 87. With this new rule the Court rejected the evidentiary formulation of *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), which had insulated from inquiry the exercise of any peremptory challenge. "To the extent that anything in *Swain* ... is contrary to the principles we articulate today, that decision is overruled." *Batson,* 476

---

1. In *Trice v. State,* No. 107, additional issues are presented. We shall address them at the appropriate time. In *Stanley v. State,* No. 82, however, the questions presented involve only the issue we just stated.

U.S. at 100 n. 25, 106 S.Ct. at 1725 n. 25, 90 L.Ed.2d at 90 n. 25.

For more than twenty years, *Swain* essentially foreclosed, in the context of the case of an individual defendant, the establishment of a violation of the equal protection clause given an apparently racially motivated exercise of a prosecutor's peremptory challenges. Under *Swain,* the significance of a defendant's fourteenth amendment equal protection claim and the apparent perversion of the purposes of the peremptory challenge might be shown only "when the prosecutor in a county, in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of Negroes who have been selected as qualified jurors by the jury commissioners and who have survived challenges for cause, with the result that no Negroes ever serve on petit juries, ..." 380 U.S. at 223, 85 S.Ct. at 837, 13 L.Ed.2d at 774. For more than twenty years this *Swain* standard presented to defendants aggrieved by the discriminatory use of peremptory challenges a virtually insurmountable burden to overcome and an almost impossible task to perform.

As a result, some courts began sidestepping *Swain* to find protection for defendants. Some of them relied on their own state constitutions. *See, e.g., People v. Wheeler,* 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978); and *Commonwealth v. Soares,* 377 Mass. 461, 387 N.E.2d 499, *cert. denied,* 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979). Others used a sixth amendment "cross-section of the community" jury analysis flowing from *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), and its heritage. *See McCray v. Abrams,* 750 F.2d 1113 (2d Cir.1984), *vacated and remanded,* 478 U.S. 1001, 106 S.Ct. 3289, 92 L.Ed.2d 705 (1986), *appeal dismissed per stipulation,* No. 84–2026 (2d Cir. 23 Oct. 1986); and *Booker v. Jabe,* 775 F.2d 762 (6th Cir.1985), *vacated and remanded,* 478 U.S. 1001, 106 S.Ct. 3289, 92 L.Ed.2d 705 (1986), *on remand,* 801 F.2d 871 (6th Cir.1986), *cert. denied,* 479 U.S.

1046, 107 S.Ct. 910, 93 L.Ed.2d 860 (1987).[2]

Finally, in *Batson v. Kentucky*, the United States Supreme Court proclaimed that the *Swain* standard was overruled. 476 U.S. at 100 n. 25, 106 S.Ct. at 1725 n. 25, 90 L.Ed.2d at 90 n. 25. The Court recognized that in the context of petit jury selection a defendant could establish a fourteenth amendment equal protection violation using only the circumstances of the defendant's own case.[3]

---

**2.** Our own decisions have not gone quite so far, but we have at least hinted that we might not always find ourselves shackled by *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965). In *Lawrence v. State*, 295 Md. 557, 457 A.2d 1127 (1983), we were urged to follow the approaches of *People v. Wheeler*, 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978), and *Commonwealth v. Soares*, 377 Mass. 461, 387 N.E.2d 499, *cert. denied*, 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979). The state of the record made it unnecessary for us to consider that argument, but we did make clear that "we do not hold that there may *never* be a violation of the fourteenth amendment through the prosecutor's use of peremptory challenges." *Lawrence*, 295 Md. at 570, 457 A.2d at 1133 [emphasis in original]. More significant is *Evans v. State*, 304 Md. 487, 499 A.2d 1261 (1985), *reconsideration denied*, 305 Md. 306, 503 A.2d 1326, *cert. denied*, 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 722 (1986), in which we also considered *McCray v. Abrams*, 750 F.2d 1113 (2d Cir.1984), *vacated and remanded*, 478 U.S. 1001, 106 S.Ct. 3289, 92 L.Ed.2d 705 (1986), *appeal dismissed per stipulation*, No. 84–2026 (2d Cir. 23 Oct. 1986). There, arguments like those used in *Lawrence* were advanced. After discussing at length *Wheeler, Soares,* and *McCray,* 304 Md. at 526–528, 499 A.2d at 1281–1282, Judge Eldridge, for the Court, in effect applied the tests and procedures used in those cases. But even assuming, arguendo, that Evans's "showing was sufficient to establish a prima facie violation of the defendant's rights" he concluded "that the explanation offered by the prosecutor, and apparently accepted by the court, was sufficient under the circumstances to support the decision of the trial judge in overruling the defendant's objection [to the use of peremptory challenges to exclude black jurors]." *Id.* at 528, 499 A.2d at 1282.

**3.** In the Court's footnote 4, it was noted that the petitioner had argued a violation of rights, under a sixth and fourteenth amendment jury analysis. The State, however, insisted that the petitioner was claiming a denial of equal protection and that *Swain* must be reconsidered to find such a violation. The Court agreed that the claim resolution properly turned on applying equal protection principles and expressed no views on the merits of the sixth amendment arguments. *Batson v. Kentucky,* 476 U.S. 79, 84 n. 4, 106 S.Ct. 1712, 1716 n. 4, 90 L.Ed.2d 69, 79 n. 4 (1986). *Also compare,* 476 U.S. at 108–111, 106 S.Ct. at

**58** ▬▬▬▬▬

"[A] consistent pattern of official racial discrimination" was not "a necessary predicate to a violation of the Equal Protection Clause." *Id.* at 95, 106 S.Ct. at 1722, 90 L.Ed.2d at 87 [citations omitted]. And a "single invidiously discriminatory governmental act" was not "immunized by the absence of such discrimination in the making of other comparable decisions." *Id.* To be consistent with the promise of equal protection to all, evidentiary requirements would not "dictate that 'several must suffer discrimination' before one could object." *Id.* at 95–96, 106 S.Ct. at 1722, 90 L.Ed.2d at 87 [citations omitted]. *Batson* set a new standard to follow.[4]

The Supreme Court declined, "however, to formulate particular procedures to be followed upon a defendant's timely objection to a prosecutor's challenges." *Batson,* 476 U.S. at 99, 106 S.Ct. at 1724, 90 L.Ed.2d at 89–90 [footnote omitted]. So for the past two years, as we shall see, state and federal courts have been fleshing out and filling in the gaps in their attempts to implement the *Batson* rule. This is our first opportunity to do likewise.[5] Specifically, in

---

1729–1730, 90 L.Ed.2d at 95–97 (Stevens, J., concurring) *with* 476 U.S. at 112–118, 106 S.Ct. at 1731–1734, 90 L.Ed.2d at 97–102 (Burger, C.J., dissenting).

4. The problem of retrospective application of *Batson* is not before us. *See Allen v. Hardy,* 478 U.S. 255, 258, 106 S.Ct. 2878, 2880, 92 L.Ed.2d 199, 204 (1986) ("*Batson* should not be applied retroactively on collateral review of convictions that became final before [the] opinion was announced") and *Griffith v. Kentucky,* 479 U.S. 314, ——, 107 S.Ct. 708, 710, 93 L.Ed.2d 649, 654 (1987) (*Batson* is "applicable to litigation pending on direct state or federal review or not yet final when *Batson* was decided"). We have here only a prospective application since *Batson* was decided on 30 April 1986. Stanley's trial began in June of that year and Trice's in December.

5. In *Clark v. State,* 306 Md. 483, 491, 510 A.2d 243, 247 (1986), *cert. denied,* 479 U.S. 1084, 107 S.Ct. 1286, 94 L.Ed.2d 144 (1987), we made brief reference to *Batson,* but only to hold that disallowance of communications between attorneys for codefendants during voir dire impairs "the efficacy with which counsel may identify and object to invidious strikes [for establishing a *Batson* prima facie case of purposeful discrimination]." The Court of Special Appeals has had *Batson* issues before it in a number of cases. *See, e.g., Parker v. State,* 72

these cases we address the procedures necessary to establish and deal with a prima facie case of a discriminatory exercise of peremptory challenges.

### B. *The Batson Procedures*

In *Batson,* the Supreme Court concluded that by using evidence concerning the prosecutor's exercise of peremptory challenges, a defendant could establish "a prima facie case of purposeful discrimination in selection of the petit jury." *Batson,* 476 U.S. at 96, 106 S.Ct. at 1722, 90 L.Ed.2d at 87. The Court said:

> To establish such a case, the defendant first must show that he is a member of a cognizable racial group ... and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." .... Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury, as in the selection of the venire, raises the necessary inference of purposeful discrimination.

*Id.* at 96, 106 S.Ct. at 1723, 90 L.Ed.2d at 87–88 [citations omitted].[6]

---

Md.App. 610, 531 A.2d 1313 (1987); *Chew v. State,* 71 Md.App. 681, 527 A.2d 332, *cert. granted,* 311 Md. 301, 534 A.2d 369 (1987), 311 Md. 557, 536 A.2d 664 (1988); and *Gorman v. State,* 67 Md.App. 398, 507 A.2d 1160 (1986) (per curiam), *vacated and remanded,* 480 U.S. 913, 107 S.Ct. 1363, 94 L.Ed.2d 680, *on remand* (filed 17 July 1987), *cert. granted,* 311 Md. 301, 534 A.2d 369 (1987).

**6.** *See Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), and *Alexander v. Louisiana,* 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972), as examples of cases from which the Court stated the showing necessary to establish a prima facie case of purposeful discrimination could be discerned.

The Supreme Court cited *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and other Title VII [7] cases such as *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983), for an explanation of the operation of prima facie burden of proof rules. *See also State v. Antwine,* 743 S.W.2d 51, 63 (Mo.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988) (*"Batson* intimates that it should be read side-by-side with the Supreme Court's Title VII cases"). *See Batson,* 476 U.S. at 94 n. 18, 106 S.Ct. at 1721 n. 18, 90 L.Ed.2d at 86 n. 18.

Although the phrase "prima facie case" "may be used by courts to describe the plaintiff's burden of producing enough evidence to permit the trier of fact to infer the fact at issue," in the Title VII context (and by implication, the *Batson* context), the phrase denotes "the establishment of a legally mandatory, rebuttable presumption." *Burdine,* 450 U.S. at 254 n. 7, 101 S.Ct. at 1094 n. 7, 67 L.Ed.2d at 216 n. 7. Also *see* B. Garner, *A Dictionary of Modern Legal Usage* 434 (1987) (citing *Burdine* for "prima facie case").

The Supreme Court was confident that trial judges, experienced in supervising voir dire, would "be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors." *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88. It cautioned, however, that "[i]n deciding whether the defendant has made the requisite showing, the trial court should consider all relevant circumstances." *Id.* at 96–97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88. By way of illustration the Court observed that a "pattern" of strikes against black jurors in the particular venire, or the prosecutor's questions and statements during the voir dire examination and the exercise of peremptory challenges

---

7. Title VII of the Civil Rights Act of 1964, Pub.L. No. 88–352, 78 Stat. 253 (codified as amended 42 U.S.C. §§ 2000e to 2000e–17 (1982)).

might give rise to or support or refute the requisite showing. *Id.* at 97, 106 S.Ct. at 1723, 90 L.Ed.2d at 88.

■ It is the defendant's burden to make that prima facie showing, but once that is done, "the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." *Id.* Although this requirement imposes some limitation on the peremptory character of the challenge, the Court emphasized that "the prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause." *Id.*

On the other hand, though, "the prosecutor may not rebut the defendant's prima facie case of discrimination by stating merely that he challenged jurors of the defendant's race on the assumption—or his intuitive judgment—that they would be partial to the defendant because of their shared race." *Id.* And the prosecutor may not rebut the defendant's case "merely by denying that he had a discriminatory motive or 'affirm[ing] [his] good faith in making individual selections.'" *Id.* at 98, 106 S.Ct. at 1723, 90 L.Ed.2d at 88 [citations omitted]. If the trial court should accept mere general assertions of racial assumptions or nondiscriminatory purposes as rebutting a defendant's prima facie case, then "the Equal Protection Clause 'would be but a vain and illusory requirement.'" *Id.* [citations omitted]. Therefore, the prosecutor "must articulate a neutral explanation related to the particular case to be tried." *Id.* [footnote omitted]. As the Court had explained in another context, "the prosecutor must give a 'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges." *Id.* at 98 n. 20, 106 S.Ct. at 1724 n. 20, 90 L.Ed.2d at 88 n. 20, quoting *Burdine,* 450 U.S. at 258, 101 S.Ct. at 1096, 67 L.Ed.2d at 218.

■ Further examination of *Batson* and the Title VII cases has convinced us that the defendant has the ultimate burden of persuading the court there has been intentional racial discrimination. *See Batson,* 476 U.S. at 94 n. 18, 106 S.Ct. at 1721 n. 18, 90 L.Ed.2d at 86 n. 18, and *Burdine,* 450

U.S. at 256, 101 S.Ct. at 1095, 67 L.Ed.2d at 217. So, once the prosecutor has come forth with reasons to rebut the defendant's case, the defendant then "must be afforded a fair opportunity to demonstrate that [the prosecutor's] assigned reason for [the peremptory challenge] was a pretext or discriminatory in its application." Paraphrasing *McDonnell Douglas,* 411 U.S. at 807, 93 S.Ct. at 1826–1827, 36 L.Ed.2d at 680. *But compare United States v. Davis,* 809 F.2d 1194 (6th Cir.) *cert. denied,* —— U.S. ——, 107 S.Ct. 3234, 97 L.Ed.2d 740 (1987) (*Batson* does not require a defense rebuttal) *with United States v. Alcantar,* 832 F.2d 1175 (9th Cir.1987) (the defendant has a right to rebut the government's explanations as pretextual), *and Williams v. State,* 507 So.2d 50, 53 (Miss.1987) (the defendant may be afforded the opportunity to challenge and rebut any "neutral, non-race based *Batson* -conforming explanations"). *And see United States v. Tucker,* 836 F.2d 334, 340 (7th Cir.1988) ("[W]e believe that adversarial hearings are the appropriate method for handling most *Batson* -type disputes").

We read *Batson* as allowing rebuttal as per the Title VII cases. *Burdine* continues to instruct that the defendant "may succeed in this [rebuttal] either directly by persuading the court that a discriminatory reason more likely motivated the [prosecutor] or indirectly by showing that the [prosecutor's] proffered explanation is unworthy of credence." Paraphrasing *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095, 67 L.Ed.2d at 217. And once the trial court has all the facts and arguments before it, it "then will have the duty to determine if the defendant has established purposeful discrimination." *Batson,* 476 U.S. at 98, 106 S.Ct. at 1723–1724, 90 L.Ed.2d at 88–89 [footnote omitted]. If that finding is made, the court must take appropriate remedial action.[8] Also *see generally,* 5 L. McLain, *Maryland Prac-*

---

8. *Batson* does not tell us exactly what happens if the trial court concludes that purposeful discrimination has been established. Should the venire be discharged and a jury selected from "a panel not

*tice: Maryland Evidence,* §§ 300.1–300.6 (burdens) and §§ 303.2–303.5 (presumptions) (1987).

In sum, the *Batson* decision "enforces the mandate of equal protection and furthers the ends of justice," thereby assuring that "no citizen is disqualified from jury service" because of race. 476 U.S. at 99, 106 S.Ct. at 1724, 90 L.Ed.2d at 89 [footnote omitted]. At the same time, the *Batson* majority disclaimed any intention of abolishing peremptory challenges:

> The standard we adopt under the Federal Constitution is designed to ensure that a State does not use peremptory challenges to strike any black juror because of his race. We have no reason to believe that prosecutors will not fulfill their duty to exercise their challenges only for legitimate purposes. Certainly, this Court may assume that trial judges, in supervising *voir dire* in light of our decision today, will be alert to identify a prima facie case of purposeful discrimination. Nor do we think that this historic trial practice, which long has served the selection of an impartial jury, should be abolished because of an apprehension that prosecutors and trial judges will not perform conscientiously their respective duties under the Constitution.

*Id.* at 99 n. 22, 106 S.Ct. at 1724 n. 22, 90 L.Ed.2d at 89 n. 22.

With these principles in mind, we proceed to consideration of the application of *Batson's* principles as we turn to the facts in Stanley's case.

---

previously associated with the case" or should the improperly challenged juror(s) simply be "reinstated on the venire ..."? *Batson,* 476 U.S. at 99 n. 24, 106 S.Ct. at 1724 n. 24, 90 L.Ed.2d at 90 n. 24 [citations omitted]. These cases do not require us to give the answer either. At least one federal court, however, has opted in favor of seating the wrongfully struck veniremember, if the discrimination is identified prior to trial. If it is not determined until after trial, "the only remedy is setting aside the conviction." *United States v. Forbes,* 816 F.2d 1006, 1011 (5th Cir.1987) [citation omitted]. Which remedy to apply may well be within the discretion of the trial court, depending on the circumstances of the particular case.

## II. APPLICATION TO THE FACTS IN NO. 82, STANLEY V. STATE

Petitioner Michael Wardell Stanley was charged with murder, robbery with a deadly weapon, and use of a handgun in the commission of a crime of violence. A jury in the Circuit Court for Prince George's County, the Honorable Vincent J. Femia, presiding, convicted him of those offenses. The court merged the robbery count into the felony murder count and imposed concurrent sentences of incarceration for life and 20 years. The Court of Special Appeals affirmed. *Stanley v. State*, No. 1175, September Term, 1986 (Md.App., filed 21 April 1987) (per curiam). We issued the writ of *certiorari*. 310 Md. 276, 528 A.2d 1287 (1987).

The jury selection aspect of Stanley's trial occurred on 4 and 5 June 1986, just over a month after the *Batson* decision. Because the State had filed notice of its intention to seek the death penalty, the pool of jurors was larger than usual and the selection process was conducted in several phases.[9] During the first phase, conducted in open court, the court asked of the entire assembled jury array general qualification questions concerning knowledge of the case and participants, connections with legal employment, contacts with crime and the criminal justice system, and so forth. Any individual indicating that he or she had a response to the court's questioning was allowed to give the answer and was then further questioned by the court and counsel before being retained in the venire or excused for cause.

The second phase of jury selection dealt solely with the death penalty qualification of the jury. Prospective jurors were individually called into the jury room where they were questioned by the court about whether their views concerning the death penalty would prevent them from rendering a fair and impartial verdict. Anyone indicating he or she

---

**9.** As it turned out, no death penalty was considered because Stanley was found guilty only as a principal in the second degree. Md.Code (1987 Repl.Vol.) Art. 27, § 412(c).

would have difficulty being impartial was excused for cause.

At the end of all death qualifications, defense counsel reiterated an objection they had made to the procedure that had been used. However, at this time one of them also raised an objection to the racial composition of the entire venire. In the course of the discussion, counsel pointed out that the county was approximately 50 percent black, and that out of the 85 announced jurors on the panel, there were only 18 blacks—a 21 percent proportion only. Counsel further objected that three of those blacks were excluded by the court for their beliefs about the death penalty without an opportunity for counsel to question them. The court responded that the excluded jurors were clearly unequivocal in their beliefs and how it might affect their jury function; that whites and blacks were excluded in the same proportion as that observed on the panel; and that the jury list was prepared by a random selection, with no racial designation on it. Counsel's challenge to the array was denied.

The court then proceeded to the next stage of the jury selection process where, on an alternating basis, defense counsel and the prosecutor were allowed to exercise their peremptory challenges. The defense used its twenty strikes and the prosecution used its ten. Of the State's ten challenges, the first five were used to excuse black people. With its sixth challenge, the State excused a white woman who had said she was "firmly opposed to the death penalty," and placed "a very high value on life." With challenges seven and eight, two more black people were removed. The ninth challenge removed a white woman who had stated at the death qualification phase that she had "heard the other ones and it didn't make any difference." Finally, an eighth black person was removed with the State's tenth and last challenge. In sum, the State had used 80 percent of its challenges to remove black people.

After the alternates were selected but before the jury was sworn, Stanley objected to the State's exercise of its peremptory challenges:

[DEFENSE COUNSEL]: May it please the Court. The records that we have kept, and I submit we kept close records of this, indicated that the State in its exercise of its peremptory challenges excluded from the panel nine out of the total of 18 blacks that were on the panel. Nine out of 10 of the strikes that were taken by the State's Attorney were members of the black race....

Defense counsel proceeded to name the excluded black jurors at which point the court questioned the race of one juror listed. The discussion continued with an indication of the race of the defendant, the victim, and the key State witness as black, and the race of the majority of the other State witnesses as white. At this point the prosecutor interjected:

[ASS'T STATE'S ATTORNEY]: He is assuming the witness list are the people that will actually testify during the trial, and at this point I don't think that is a fair assumption.

THE COURT: Is your motion, [Defense Counsel], that the State has acted improperly by exercising its peremptory challenges in such a way as to unbalance the jury racially?

[DEFENSE COUNSEL]: Yes.

[ASS'T STATE'S ATTORNEY]: Your Honor, for the record I would point out, and I believe that [Defense Co–Counsel] wanted this on the record earlier.

The actual jury panel that we had to pick from, which obviously the State's Attorney's Office has no way of forming. We get it just the way the Defense does. It was approximately 75 percent white as a panel.

[DEFENSE COUNSEL]: It was more than that.

[ASS'T STATE'S ATTORNEY]: If we look at the jury that has in fact been selected you will find that three out of the 12 jurors actually on the jury are black. That

would approximately be 75 percent. So that would be a direct correlation to what the panel was, what the State and the Defense had to choose from originally.

If his objection is on an individual basis that each one when I struck the individual he wanted to object because he thought I was striking an individual because of their race, it is my understanding that the Defense has the burden at that point to ask to approach the bench. I think the case is Batson versus Kentucky.

At that time if you felt I did something improper you would be able to inquire of me what my exact reason was, even though it was a peremptory challenge.

If his argument is as a whole the way it was done I would just submit on what I have already argued.

Defense counsel disputed the prosecutor's reading of *Batson,* claiming instead that it was clear the State had systematically attempted to severely limit the number of blacks on the jury and had succeeded through the exercise of eight out of 10 peremptory challenges to black jurors alone. At this juncture, defense counsel thought the State should be required to explain the basis of its challenges so it would be clear they were not racially motivated.

The court, however, simply noted for the record the race of the excluded jurors and proceeded to name them. At that time, though, another dispute arose as to the race of one of the named jurors. The court then said:

THE COURT: You see the problem is Ms. Lewis may well have been black. The problem is we in Prince George's County gave up keeping track of people's colors 17 years ago. We don't keep a record of people's races. The computer doesn't have the racial designation on it when it selects people.

Somebody will be in trouble if this issue is appealed trying to figure out what color this list was because by law we may not keep racial designations. So the Supreme Court in its efforts in the Batson case has really put the rest of the world in trouble. They have been

telling us for 30 years don't make any decisions predicated upon race, creed, color, religion, national origin, and Article 46 says sex. So we stopped doing all of that. The next thing they want to know is what color is everybody. You can't have it both ways.

I will tell you at this point I am the lowly trial judge, and I am at a loss as to what to do except to tell you, [Defense Counsel], I perceive no more indication of striking blacks on the part of the State than I do on your part. I notice that your very first strike, second strike—no, your very first strike was Mr. Ronald Dendy. Then it was Mrs. Shirley Thomas. You can go on through like that.

I don't perceive it as trying to find out who is more white or black. God forbid we go back to those days.

I just see no racially motivated evidence of—evidence of racially motivated exercise of the strikes in this court. I deny your motion.

Maybe at some later date someone will tell me how to do it. They will have a real problem, a real problem. I'm not sure about the rest of Maryland, but they have [a] real problem in Prince George's County because we haven't kept racial designations since 1969.

I guess next we will go back to seeing the names in the newspaper, John Smith, colored.

That ruling is completed, gentlemen.

The day has come for us to tell the trial court "how to do it. . . ." But first we pause for some preliminary observations on the subject of preservation of *Batson* issues.

The State has conceded and we agree that Stanley made a timely objection to the peremptory challenges used in this case. As indicated in the voir dire record, however, the prosecutor had stated he understood it was the defendant's burden to object at the point of the strike of each and every individual perceived to be racially stricken. *See also Chew v. State,* 71 Md.App. 681, 698 n. 7, 527 A.2d 332, 340 n. 7,

*cert. granted,* 311 Md. 301, 534 A.2d 369 (1987), and No. 166 (21 January 1988) (noting Indiana and Texas cases requiring objections *both* when the juror is excluded and after the jury is selected but not sworn).

 We disagree with the Indiana and Texas viewpoint. A *Batson* objection is timely if the defendant makes it no later than when the last juror has been seated and before the jury has been sworn. By waiting, rather than objecting to the first and every subsequent strike of a black juror, a clearer picture of what the State is doing may be seen; a pattern may form. And if the objection is delayed, the trial court will have before it the total facts and circumstances of jury selection and thus will be in a better position to make the necessary *Batson* rulings, and to apply an appropriate remedy if one is called for. *See* n. 8, *supra.* As Judge Robert Bell stated for the Court of Special Appeals in *Parker v. State,* 72 Md.App. 610, 617–618, 531 A.2d 1313, 1317 (1987):

> It is clear … that a *prima facie* case of the unconstitutional exercise of peremptory challenges cannot be established until the relevant facts and circumstances are known and reflected in the record of the proceeding. It follows, therefore, that an objection premised upon such unconstitutional exercise appropriately may not be raised, or, at the least, is not cognizable, until the factual predicate for it exists. Ordinarily the predicate will not exist until the last member of a cognizable racial group has been stricken or the twelfth juror has been seated, although not sworn. Only then, when all of the facts and circumstances necessary to a ruling on the objection are before it, is the court enabled to assess meaningfully the validity of the objection [footnote omitted].

We add a caveat, however. While an objection made just before the jury is sworn will ordinarily be sufficient to preserve a *Batson* issue for appellate review, under some circumstances prudence may suggest some action at an

earlier time.[10]

Returning to the merits, we are initially faced with the State's contention that, as the Court of Special Appeals concluded, Judge Femia determined that Stanley had failed to make a prima facie showing of purposeful discrimination. The State's argument rests on the trial judge's final remarks in the dialogue last quoted. It is impossible to tell from these remarks whether the judge was attempting to make a *Batson* prima facie case ruling or whether he was philosophizing in a general way about racial matters in his Prince George's County court and in Prince George's County in general. Certainly, he did not enumerate the *Batson* criteria or articulate any specific bases for finding lack of a prima facie showing: was there a failure to meet the *Batson* criteria, what matters had he observed during jury selection, were there apparent reasons (based on those observations) for striking certain blacks on nonracial grounds, and the like? [11]

---

**10.** If, for example, there is a question as to the race of a potential juror who has been the subject of a peremptory strike, it may be advisable to object at that point, in order to obtain a factual finding as to race while the juror is still available. And if one appropriate remedy for a *Batson* violation is to seat the unconstitutionally stricken jurors (*see* n. 8, *supra* ), it is important to bring the *Batson* problem to the court's attention promptly. Otherwise, the jurors in question might be excused, and no longer available, if the court ultimately finds that peremptory challenges have been exercised in an unconstitutionally discriminatory manner. Thus considerations of making an appropriate record (*see* n. 11, *infra* ) and of keeping open options as to a proper remedy are among the considerations that may prompt careful counsel, under some circumstances, to object at a relatively early point in the jury selection process. Similar considerations may guide counsel in deciding the manner in which peremptories are exercised (*e.g.,* challenge jury or struck jury).

**11.** We emphasize here the need for the record to contain not only specific findings by the judge, but also information to support those findings; information such as the numbers of blacks and whites on the venire, the numbers of each stricken for various reasons, the reasons underlying strikes for cause, pertinent characteristics of jurors excluded and retained, relevant information about the race of the defendant, the victim, and potential witnesses, and so forth.

Essentially, the judge did little more than state a conclusion. This is not surprising. Although it is apparent from the quoted colloquy that both court and counsel were aware of *Batson,* it is also true that the case was newly decided. It is understandable that no one was fully aware of all the requirements and nuances of the case. But be that as it may, the trial judge did not make any specific findings. Moreover, the relevant facts are not disputed. Under these circumstances we exercise our independent constitutional judgment with respect to the conclusion to be drawn from them. *See Chase v. State,* 309 Md. 224, 237, 522 A.2d 1348, 1354 (1987); *McIntyre v. State,* 309 Md. 607, 623, 526 A.2d 30, 37 (1987). The object of our inquiry is to determine whether these facts demonstrate the existence of a prima facie case as a matter of law.

As *Batson* has referred us to them, we turn to the Title VII cases for the explanation of the operation of prima facie burden of proof rules. *Batson,* 476 U.S. at 94 n. 18, 106 S.Ct. at 1721 n. 18, 90 L.Ed.2d at 86 n. 18. We can deduce that the prima facie showing threshold is not an extremely high one—not an onerous burden to establish. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1094, 67 L.Ed.2d at 215. It simply requires the defendant to prove by a preponderance of the evidence that the peremptory challenges were exercised in a way that shifts the burden of production to the State and requires it to respond to the rebuttable presumption of purposeful discrimination that arises under certain circumstances.

Those circumstances, under the *Batson* model for a prima facie case of racial discrimination (*cf., Burdine,* 450 U.S. at 253 n. 6, 101 S.Ct. at 1094 n. 6, 67 L.Ed.2d at 215 n. 6) are, first, that the defendant is a member of a cognizable racial group and that the State has used peremptory challenges to remove members of that racial group from the venire. These facts are conceded here. "Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of

a mind to discriminate.'" *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723, 90 L.Ed.2d at 87. And finally, the defendant must show that these facts and any other relevant circumstances raise a rebuttable presumption that "the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." *Batson*, 476 U.S. at 96, 106 S.Ct. at 1723, 90 L.Ed.2d at 87–88. *See also State v. Slappy*, 522 So.2d 18 (Fla.1988), in which the Supreme Court of Florida resisted the temptation to craft a bright-line test and obscure the issue in procedural rules governing the shifting burdens of proof. In providing broad leeway in allowing parties to make a prima facie showing that a "likelihood" of discrimination exists, the court said "we hold that any doubt as to whether the complaining party has met its initial burden should be resolved in that party's favor. If we are to err at all, it must be in the way least likely to allow discrimination." 522 So.2d at 22.

■ What are the circumstances here? While there was a dispute over the race of one of the jurors, making it unclear whether seven or eight blacks had been stricken from the jury, we shall accept the prosecutor's concession that there were eight. Thus, the State used 80 percent of its peremptory challenges (eight of 10 strikes) to strike blacks from the jury panel. Although three blacks survived to the final panel, the State eliminated almost one-half of the blacks on the venire by use of a highly skewed number of its peremptory challenges. It used 80 percent of its strikes to remove blacks who constituted less than 25 percent of the venire. *See, e.g., Miller–El v. State*, 748 S.W.2d 459 (Tex.Crim.App.1988), a case in which there was a similar use of a highly "skewed number" of peremptory challenges to black jurors. *Also see Powell v. State*, 182 Ga.App. 123, 355 S.E.2d 72 (1987), where the State exercised nine of its 10 peremptory challenges to excuse nine of the 12 black veniremen. Three blacks were on the jury, but that was not the determinative fact. There the court said "[t]he question is whether the state exercised *any* of its strikes for a racially discriminatory reason, for if it did, the

rule of *Batson* was violated." *Id.* at 124, 355 S.E.2d at 73.

We note in this case that the defendant, victim, and key State witness were black whereas the police officers and other witnesses were white. But we further note, as far as voir dire is concerned, that only two of the excluded black jurors indicated any response to any of the court's questions. And based on those responses, neither juror seems a clear choice for prosecution challenges, nor do the other six blacks who gave no responses. On the other hand, the two excluded white jurors had responded to the death qualification questioning in a manner that made it clear the State might like to exclude them. Compare these circumstances with those in *State v. Robbins,* 319 N.C. 465, 493–496, 356 S.E.2d 279, 295–296, *cert. denied,* —— U.S. ——, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987), where the State exercised seven of its 13 peremptories to exclude blacks, yet the attendant circumstances surrounding the exercise did not raise the necessary rebuttable presumption of racial discrimination. The court there found that many of the challenged blacks had expressed reservations to the death penalty.

We believe that given the circumstances and the information at hand, there was enough evidence presented to establish a prima facie case of discrimination against black jurors. We point out that the question in this type of case is whether a legally mandatory rebuttable presumption was established to which the State will now have a full opportunity to respond. We hold that it was so established.

Many other jurisdictions have reached this result on often similar facts. For example, *see* the following cases where prima facie showings were established:

*United States v. Battle,* 836 F.2d 1084 (8th Cir.1987) (The government exercised five of its six (83%) allowable peremptory challenges to strike five of the seven (71%) blacks from the jury panel); *Fleming v. Kemp,* 794 F.2d 1478, 1484

(11th Cir.1986) (The defendant made out, at a minimum, a colorable *Batson* claim as the prosecutor had used eight of ten peremptory challenges to strike blacks from the jury where the venire (after challenges for cause) consisted of only 10 blacks and some 45 whites). *Fleming* went on to state:

> First, the court found that because all black jurors were not excluded from Fleming's jury as they were in *Batson,* the latter case did not apply. But nothing in *Batson* compels the district court's conclusion that constitutional guarantees are never abridged if all black jurors but one or two are struck because of their race. On the contrary, *Batson* restates the principle that " '[a] single invidiously discriminatory governmental act' is not 'immunized by the absence of such discrimination in the making of other comparable decisions.' " ... We cannot agree that *Batson* may be rendered a priori inapplicable by a prosecutorial game of numbers.

*Id.* at 1483 [citations omitted]. *Also see Ex parte Branch,* 526 So.2d 609 (Ala.1987) (The State struck six of seven blacks from the jury venire); [12] *Ward v. State,* 293 Ark. 88, 733 S.W.2d 728 (1987) (All eight of the peremptory challenges exercised by the prosecutor were used to strike black people from the jury; an all white jury convicted the black defendant); *Slappy v. State,* 503 So.2d 350, 352 (Fla.Dist.Ct.App.1987), *decision approved, State v. Slappy,* 522 So.2d 18 (Fla.1988) (The State exercised four of its six challenges to exclude black members of the prospective jury

---

12. The opinion in *Ex parte Branch,* 526 So.2d 609 (Ala.1987), also supplies useful guidelines for trial courts faced with *Batson* challenges. It gives numerous illustrations of types of evidence raising inferences of discrimination; of evidence overcoming the discriminatory presumption and showing neutrality; and of evidence showing sham or pretext.

panel); *Powell v. State, supra* (nine of 10 challenges were used by the State to exclude nine of the 12 black veniremen); and *State v. Brinkley, supra,* (four or five of the State's challenges were used to strike black jurors).[13]

█ Since Stanley showed a prima facie case of purposeful discrimination by establishing a rebuttable presumption to that effect, what is the remedy?

One possibility, obviously, is to set aside Stanley's conviction by an arguably tainted jury, and to order a new trial. Quite understandably, that is the relief Stanley seeks. Another possibility is a limited remand under Rule 871, to permit the State to provide, if it can, racially neutral reasons for its use of peremptories.[14] A Rule 871 remand may

---

**13.** *But see, Mincey v. State,* 257 Ga. 500, 360 S.E.2d 578 (1987), where the court said there was no prima facie showing when "the prosecutor used seven of his 10 strikes to remove blacks from the venire; that the state accepted five black jurors prior to exhausting its strikes; that the state utilized five strikes on blacks, three on whites, and the race of two panel members was not noted on the record; and that there were at least three blacks on the jury." *Id.* at 503, 360 S.E.2d at 582. *And see State v. Abbott,* 320 N.C. 475, 358 S.E.2d 365 (1987), where the State exercised peremptory challenges to three of the five blacks tendered as prospective jurors, *i.e.,* it was willing to accept 40 percent of the blacks tendered. The court said "[t]here was not a showing from the State's action ... that it was determined not to let a black sit as a juror on account of the race of the defendant." *Id.* at 482, 358 S.E.2d at 369–370.

**14.** Md.Rule 871 a in pertinent part provides:
If it shall appear to this Court ... that the purposes of justice will be advanced by permitting further proceedings in the cause ... then this Court, instead of entering a final order affirming, reversing or modifying the judgment from which the appeal was taken, may order the case to be remanded to the appropriate court. Upon remand to the appropriate court, such further proceedings shall be had ... as may be necessary for determining the action upon its merits as if no appeal had been taken and the judgment from which the appeal was taken had not been entered; provided, however, the order entered by this Court in remanding said case, and the opinion of this Court on which said order is passed, shall be conclusive as to the points finally decided thereby. In such an order remanding a case, this Court will express the purpose for so remanding and in its opinion filed with said order will determine all questions which may have been properly presented.

be appropriate " 'to correct procedures subsidiary to the criminal trial, [but] it can never be utilized to rectify prejudicial errors committed during the trial itself.' " *Reid v. State*, 305 Md. 9, 15, 501 A.2d 436, 439 (1985) (quoting *Gill v. State*, 265 Md. 350, 357, 289 A.2d 575, 579 (1972)) (on motion for reconsideration). Here, the peremptory strikes were exercised before the jury was sworn, and thus before the beginning of the trial on the merits. Moreover, limited remand was the remedy applied in *Batson*. 476 U.S. at 100, 106 S.Ct. at 1725, 90 L.Ed.2d at 90.

We shall order a limited remand in this case. We are aware of Stanley's contention that a limited remand is impracticable, given the lapse of some two years since the original jury selection. That concern was voiced in *Batson* also: "[I]t would be virtually impossible for the prosecutor in this case to recall why he used his peremptory challenges in the fashion he did." 476 U.S. at 133 n. 12, 106 S.Ct. at 1742 n. 12, 90 L.Ed.2d at 111 n. 12 (Burger, C.J., dissenting). Nevertheless, the State has never had an opportunity to respond to Stanley's prima facie showing. We again advert to the novelty of the *Batson* decision when jury selection was undertaken in this case and to lack of familiarity with its prescribed procedures. As a matter of fairness, we believe the State should be afforded a chance to explain its challenges, if it can.[15] On remand, then, the trial court will accept that a prima facie showing of purposeful discrimination has been made and will conduct a hearing into the circumstances of the exercise of the State's peremptory challenges.

Other courts have followed the same course as we are doing and have remanded for the hearings to commence at

---

15. This is not to say though that we will always remand for an evidentiary hearing. There may come a time when we would simply reverse and remand for a new trial. For an example of a case that was reversed and a new trial ordered, *see People v. Scott*, 70 N.Y.2d 420, 426, 522 N.Y.S.2d 94, 98, 516 N.E.2d 1208, 1212 (1987) ("A hearing is inappropriate in this case, however, because of the absence of a record and the impossibility of securing one.").

the inquiry into the prosecutor's reasons for the peremptory challenges. *See, e.g., United States v. Leslie,* 813 F.2d 658 (5th Cir.1987) (*Batson* retroactively governs the issue of the complained of challenges and on remand the prosecution is to submit its explanations); *United States v. Chalan,* 812 F.2d 1302 (10th Cir.1987) (being a pre-*Batson* trial, neither the trial court nor the parties were aware of the standards to be used to evaluate the Government's proffered reasons); *Ex parte Branch, supra,* 526 So.2d at 611 (although, based upon an independent review of the record, the appellate court felt it could reverse the case, in the interest of justice, as *Batson* had just been decided when the case was tried, the court remanded to give the trial court an opportunity to review again the sufficiency of the state's explanation); *Powell v. State, supra,* 182 Ga.App. at 124–125, 355 S.E.2d at 73 (circumstances raised the inference of a racially discriminatory exercise, but the appellate court could not say as a matter of law that the explanations were constitutionally sufficient, so an evidentiary hearing was necessary); *Saadiq v. State,* 387 N.W.2d 315, 329 (Iowa), *appeal dismissed,* 479 U.S. 878, 107 S.Ct. 265, 93 L.Ed.2d 242 (1986) (the district court was "directed to find whether the prosecutor did or did not purposefully discriminate . . ."); *State v. Hood,* 242 Kan. 115, 744 P.2d 816 (1987) (remanded, not for further evidence, but for further argument as to the propriety of the peremptory challenges exercised by the state); *Dedeaux v. State,* 519 So.2d 886, 888 (Miss.1988) (when the defendant put the use of peremptory challenges in issue, it was proper to remand to get state explanations); and *Williams v. State, supra,* 507 So.2d at 53 (case remanded for prosecution explanations when Williams made out a prima facie case of illicit jury strikes).

■ At this inquiry hearing into the State's reasons for its peremptory challenges, we point out that those challenges must not be examined in a vacuum. Rather, each strike must be examined "in light of the circumstances under which it [was] exercised, including an examination of the explanations offered for other peremptory strikes."

*State v. Martinez,* 294 S.C. 72, 76, 362 S.E.2d 641, 643 (1987) (Ness, C.J., dissenting) (citing *Gamble v. State,* 257 Ga. 325, 357 S.E.2d 792 (1987)). "Rubber stamp" approval to any and all nonracial explanations offered should not be given.

As to whether the prosecutor's explanations have rebutted the defendant's prima facie case of discrimination, two general questions arise: "First, does any non-racial reason satisfy the 'neutral explanation' required under *Batson* or must the trial judge determine that the explanations are bona fide and not 'sham excuses belatedly contrived to avoid admitting acts of group discrimination'?" and, "[s]econd, what criteria should be used to determine if an explanation is genuine?" *State v. Butler,* 731 S.W.2d 265, 268 (Mo.Ct.App.1987).

> *Batson* explicitly addresses the first question. The explanation must be neutral, related to the case to be tried, clear and reasonably specific, and legitimate. 476 U.S. at 98 & n. 20, 106 S.Ct. at 1723 & n. 20, 90 L.Ed.2d at 88 & n. 20.

> *Batson* also implicitly approves inquiry into the legitimacy of the explanations because otherwise *Batson* would become a right without a remedy. "Rubber stamp" approval of all nonracial explanations, no matter how whimsical or fanciful, would cripple *Batson's* commitment to "ensure that no citizen is disqualified from jury service because of his race." ... Without some form of inquiry, a prosecutor could easily conceal his true reason for removing black jurors by simply inventing "neutral" reasons for the strikes.... ("[A]ny prosecutor's office could develop a list of 10 or 15 standard reasons for striking a juror: ..."). *Batson* would then merely reinstate, in another form, the "mission impossible" of *Swain....* *Batson* surely cannot be read to produce such an anomalous result.

*Butler,* 731 S.W.2d at 268–269 [citations omitted].

With respect to the second question, there are several factors the trial judge can use to evaluate the legitimacy of

the prosecutor's explanations. These factors include "the susceptibility of the particular case to racial discrimination, . . . the race of the victims and primary witnesses, . . . the prosecutor's demeanor, . . . a past pattern of discriminatory practices by a prosecutor's office, . . . whether similarly situated white jurors were struck on identical or comparable grounds." *Id.* at 269.

> In addition, the explanation should not "sweep so broadly as to attenuate its validity" . . . If the juror is excluded because of a trait other than race, the trait must apply to the juror specifically and to the facts of the particular case.

*Butler,* 731 S.W.2d at 269 [citations omitted].

This analysis was also utilized in *State v. Antwine, supra,* 743 S.W.2d at 65, where the Supreme Court of Missouri pointed out that *Batson* calls for subjective as well as objective analysis. And as the Supreme Court of Georgia said in *Gamble v. State,* 257 Ga. 325, 327, 357 S.E.2d 792, 795 (1987):

> The explanation offered for striking each black juror must be evaluated in light of the explanations offered for the prosecutor's other peremptory strikes, and, as well, in light of the strength of the prima facie case. The persuasiveness of a proffered explanation may be magnified or diminished by the persuasiveness of companion explanations, and by the strength of the prima facie case.

*And see Slappy v. State, supra,* which explained that the trial court is not bound to accept the prosecutor's explanations at face value but should evaluate the proffered explanations in light of recognized standards, circumstances of the case, and court knowledge of trial tactics "in order to make a reasoned determination that the prosecutor's facially innocuous explanations are not contrived to avoid admitting acts of group discrimination," 503 So.2d at 355–356.

■ If the State can honestly come forth with neutral, nonracial reasons for each of its challenges to a black juror, and if the trial court, after examining the State's explanations within the entire context of the voir dire proceedings, finds all eight challenges have been satisfactorily justified and there was no evidence of a discriminatory purpose, then Stanley's convictions and sentences will stand affirmed.[16]

On the other hand, however, if the State cannot, in all honesty, remember the reasons for each of its challenges, or if the trial court finds, in the context of the entire voir dire proceedings, any *one* of the State's explanations as simply a pretext or discriminatory in its application, then Stanley's convictions will be set aside and he will be afforded a new trial.

### III. APPLICATION TO THE FACTS IN NO. 107, TRICE V. STATE

We now turn our attention to *Trice v. State.* A jury in the Circuit Court for Baltimore County, the Honorable William R. Buchanan, Sr., presiding, convicted Trice of two counts of burglary, two counts of malicious destruction of property, and one count of theft of goods valued in excess of $300. Judge Buchanan imposed a mandatory sentence of 25 years without parole for one burglary conviction, and a 20–year concurrent sentence for the other. He ordered concurrent three-year terms for the malicious destruction convictions. He merged the theft conviction. Trice appealed to the Court of Special Appeals. We granted certiorari on our own motion before the case had been decided in the

---

**16.** In analyzing the challenges in the context of the entire voir dire, the trial court shall allow Stanley the opportunity to rebut the State's explanations. This should include allowing him to point out any voir dire inconsistencies that might expose as "pretext" any State justifications, that, only on their face, may appear sufficiently racially "neutral." *See* our discussion dealing with defendant rebuttal, pp. 61–62, *supra.*

intermediate appellate court. 310 Md. 695, 531 A.2d 682 (1987).

Jury selection in this case occurred on 8 December 1986. Before the beginning of voir dire, Trice challenged the jury array on the ground that it contained only one black prospective juror. The court pointed out that the prospective jurors were randomly selected from the voter registration lists of Baltimore County; it rejected the challenge *sub silentio*.

Voir dire commenced, as in Stanley's case, with the judge asking the usual questions about knowledge of the case and the participants in it, contacts with crime or the criminal justice system and the like. Except for these routine inquiries, no questions were asked. The lone black veniremember was one of many who responded to none of the court's questions.[17]

Following the qualification of the jury, jurors were called to the box one at a time with both the State and the defense having the opportunity to strike each juror on an alternating basis. In filling the box, the defense utilized 19 strikes, but the State struck no one. The State, however, then utilized its five peremptory challenges to remove jurors from the box and refill those vacancies. The defense utilized no additional strikes.[18] The black juror was the last

---

17. Earlier on, at n. 11 and accompanying text, we noted the importance of a full record to support a *Batson* challenge. We reemphasize that point. The record as originally transmitted in this case contained no means of identifying which veniremember was black, nor did it contain a transcript of the voir dire proceedings, that portion of the record reflecting the exercise of strikes, or a list of the venire. These deficiencies were supplied by motions to correct and supplement the record, Md.Rule 826(f), but should not have occurred in the first place.

18. Just how the defense got to exercise 19 peremptory strikes is something of a mystery in this single-defendant burglary trial. It is true that prior to 1 July 1986 a defendant subject to a sentence of death or imprisonment for 20 years or more was allowed 20 peremptories and the State 10. Md.Code (1984 Repl.Vol.) § 8–301(a) of the Cts. & Jud.Proc.Art.; Md.Rule 4–313(a)(2) (1986 Repl.Vol.). Since, as we shall later see, Trice was a recidivist subject to imprisonment for

person the State challenged. In selecting the two alternate jurors, the defense used two peremptory strikes and the State one.

At the conclusion of this process, the parties approached the bench and the following occurred:

[DEFENSE COUNSEL]: For the record, Your Honor, I complained initially there was only one black on the entire jury panel. Now that that black has been struck by the State, I don't think that this is Mr. Trice's peers, I think his due process rights have been violated, and I ask for a mistrial at this point in time.

THE COURT: What did you strike him for?

[ASS'T STATE'S ATTORNEY]: Your Honor, the State does not have to advise the court of peremptory strikes. I could have stricken him because of where he lived or his age, or whatever. The fact he was of the same race as Mr. Trice—

[DEFENSE COUNSEL]: The problem arises, being that —like I said at the beginning, there was only one on the entire panel to start with—

THE COURT: There is nothing I can do about that.

[DEFENSE COUNSEL]: —which is a violation, I feel, of his due process rights. Knowing that there is more than a one per cent black population in Baltimore County, maybe there was a bad selection, yet, I don't think Mr. Trice should have to suffer for that, only this one on the panel, and that one has been struck. I think it's a

25 years without parole on conviction of burglary, it may be that he could be deemed subject to imprisonment for 20 years or more on any single count. Md.Code (1987 Repl.Vol.) Art. 27, § 643B(c). But jury selection occurred in December of 1986, and by then both the statute and the rule had been amended to allow only 10 strikes for the defendant and five for the State, even assuming that the potentiality of a mandatory recidivist sentence under Art. 27, § 643B made the potential sentence one of 20 years or more, but less than life. Md. Code (1984 Repl.Vol., 1986 Cum.Supp.) § 8–301(c) of the Cts. & Jud.Proc.Art.; Md.Rule 4–313(a)(3) (1986 Repl.Vol., 1986 Supp.). But no one has raised any question about this aspect of jury selection. We shall assume that there was an agreement, implicit or otherwise, by each side to permit additional strikes.

violation of my client's due process rights. I would ask for a mistrial.

The court denied the mistrial motion. Trice now says this was tantamount to a *Batson* violation. We agree. Before explaining why we agree, however, we must first address the State's argument that the issue is not preserved.

■ The State's position is that defense counsel never ascribed any improper motive to the prosecutor's use of peremptories; that the only objection really raised was to the fact that the array contained but a single black. It is true that Trice's lawyer did not refer expressly to *Batson* or to equal protection. But in addition to his challenge to the array, he objected immediately following the striking of the black juror. And he made it plain that it was this action by which his client was aggrieved. Judge Buchanan seemed to perceive the existence of a *Batson* issue, because he asked the prosecutor to state reasons for that particular strike. Under the circumstances (including the relative novelty of *Batson* at that time), we believe the objection sufficiently drew the court's attention to Trice's complaint that he had been discriminated against by the State's removal of the lone black juror via peremptory strike. *See Webb v. State*, 311 Md. 610, 614–615, 536 A.2d 1161, 1163 (1988). *See also DeBlanc v. State*, 732 S.W.2d 640, 642 (Tex.Crim.App.1987) (*Batson* issue preserved when defendant moved to challenge array and also pointed out that prosecutor was using peremptories on blacks). We hold the issue was preserved.

■ As we move to the substance of the issue, we note that Judge Buchanan, when the defense objection was raised, asked the State to explain the reasons for its strikes. This was at least an implied finding of the existence of a prima facie case of discrimination. *State v. Hood, supra*, 242 Kan. at ——, 744 P.2d at 822; *State v. Walton*, 227 Neb. 559, 562, 418 N.W.2d 589, 591 (1988); and *People v. Granillo*, 197 Cal.App.3d 110, 242 Cal.Rptr. 639 (1987). *Also see Saadiq v. State, supra*, 387 N.W.2d at 329 (under

similar circumstances, case remanded to allow state opportunity to explain). Nor can we say that Judge Buchanan's implicit finding was clearly erroneous.

The first two prongs of the *Batson* analysis are satisfied. It remains only to consider whether all the relevant circumstances are sufficient, taken together, to raise a rebuttable presumption that the State used the selection process to exclude the black venireman because of his race.

 The question that first presents itself is whether the striking of one juror is enough to establish a prima facie case of purposeful discrimination? That is an important question and it will surely come up again. Other jurisdictions have been presented with it and they have been divided in their results. For cases finding the striking of one juror can be enough to raise a prima facie case of discrimination, *see United States v. Cloyd*, 819 F.2d 836 (8th Cir.1987) (sole black venireperson peremptorily challenged and removed); *United States v. Love*, 815 F.2d 53 (8th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 177, 98 L.Ed.2d 130 (1987) (sole black venireperson was peremptorily challenged and removed); and *Saadiq v. State, supra,* 387 N.W.2d at 326 (State peremptorily removed the only black person from the jury).

Also, in *United States v. Gordon*, 817 F.2d 1538 (11th Cir.1987), *vacated on reh'g in part on other grounds,* 836 F.2d 1312 (11th Cir.1988), the court said "[i]t is important to emphasize, as we did in *United States v. David*, 803 F.2d 1567, 1571 (11th Cir.1986), that under *Batson*, the striking of a single black juror for a racial reason violates the Equal Protection Clause, even where other black jurors are seated, and even when there are valid reasons for the striking of some black jurors." 817 F.2d at 1541. And in *United States v. Chalan, supra,* the court said "the additional fact that the Government used its peremptory challenges to strike the last remaining juror of defendant's race" was enough to imply that the juror "was excluded 'on account of

[his] race,' thereby satisfying the final portion of the *Batson* test." 812 F.2d at 1314.

On the other hand, for cases stating the strike of one juror was not enough, *see United States v. Ingram*, 839 F.2d 1327, 1330 (8th Cir.1988) (bare reliance on the fact that one black [of two] was struck was not enough for a prima facie case); *United States v. Lewis*, 837 F.2d 415 (9th Cir.1988) (No circumstances were shown to raise a prima facie case of discrimination beyond the fact of a strike against a black venireman); *United States v. Porter*, 831 F.2d 760, 767–768 (8th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1037, 98 L.Ed.2d 1001 (1988) ("bare reliance on the fact that the government used one of its peremptory challenges to exclude one of the two black veniremen falls short" of showing a prima facie case of purposeful discrimination "necessary to establish a prima facie case under *Batson* "); and *Gray v. Commonwealth*, 233 Va. 313, 356 S.E.2d 157, *cert. denied,* —— U.S. ——, 108 S.Ct. 207, 98 L.Ed.2d 158 (1987) (purposeful discrimination was not implied by the peremptory strike of one black when the record indicated there existed a neutral and nondiscriminatory basis for the strike).

But we have more than simply one strike in this case. By the use of that one challenge, we have the removal of 100 percent of the jurors of Trice's race from the panel. Numerous jurisdictions have also dealt with the total exclusion of members of the defendant's race from the jury. Under those circumstances most courts have found that total elimination establishes a prima facie case requiring explanations from the prosecution. For prima facie cases established where 100 percent or all members of the defendant's race were removed, *see United States v. Clemons*, 843 F.2d 741 (3d Cir.1988) (a prima facie case finding was permissible where the government excluded the only two black members of the jury panel); *United States v. Tucker, supra,* 836 F.2d at 337–338 (The prosecution exercised four of its seven peremptory challenges to exclude all four blacks on the venire and the parties did not dispute the existence of a

*Batson* prima facie case); *United States v. Thompson,* 827 F.2d 1254 (9th Cir.1987) (The government used four of its peremptory challenges to exclude all four blacks in the venire and conceded the existence of a prima facie case under *Batson* ); *United States v. Gordon, supra,* 817 F.2d at 1541 (case remanded where government exercised its six peremptory challenges to remove every black venireperson from the jury); *United States v. Brown,* 817 F.2d 674 (10th Cir.), *on remand from Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) (Thinking it prudent to excuse all blacks, the government peremptorily challenged two black jurors because of a presumption of an affinity due to racial identity between the prospective jurors and defense counsel); *Garrett v. Morris,* 815 F.2d 509 (8th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 233, 98 L.Ed.2d 191 (1987) (prosecutor utilized three of his peremptory challenges to exclude the only three black venirepersons from the petit jury panel); *United States v. Chalan, supra,* 812 F.2d at 1314 ("If all of the jurors of defendant's race are excluded from the jury, we believe that there is a substantial risk that the Government excluded the jurors because of their race"); *Ward v. State, supra,* 293 Ark. at —, 733 S.W.2d at 731 ("Actions sometimes speak louder than words, and any prosecutor who uses all of his peremptory challenges to strike black people better have some good reasons available"); *Gamble v. State, supra,* 257 Ga. at 327, 357 S.E.2d at 794 (1987) (the prosecutor used his 10 peremptory challenges to strike all 10 blacks from the venire; a prima facie case was clearly made); *State v. Hood, supra,* 242 Kan. at —, 744 P.2d at 820 ("The fact that a prosecutor has, by peremptory challenge, removed all members [in this case two]—or the only member—of the accused's race or minority group from the venire is in itself sufficient" to establish a prima facie case of discriminatory purpose); *Dedeaux v. State, supra,* 519 So.2d at 887 (State struck all four remaining blacks of the final 24 person jury panel); *Williams v. State, supra,* 507 So.2d at 51 (Five of the six prosecution challenges were used to strike the

remaining five black veniremen); *State v. Walton, supra,* 227 Neb. at 559, 418 N.W.2d at 590 (all three of three blacks were struck); *State v. Butler, supra,* 731 S.W.2d at 267 (the prosecutor used her six peremptory challenges to strike all six black jurors); *People v. Scott,* 70 N.Y.2d 420, 522 N.Y.S.2d 94, 516 N.E.2d 1208 (1987) (all five prospective black jurors were excluded); *Johnson v. State,* 731 P.2d 993, 999 (Okla.Crim.App.) *cert. denied,* —— U.S. ——, 108 S.Ct. 35, 98 L.Ed.2d 167 (1987) (the removal of all three remaining blacks from the venire establishes a prima facie case of racial discrimination); and *State v. Bell,* 745 S.W.2d 858 (Tenn.1988) (the issue was not if the State struck *only* black jurors, but if it struck *all* blacks from the panel finally selected).[19]

■■■ Like the majority of courts that have considered the question, we believe that when the State uses peremptories in a manner that assures that *no* blacks will serve on a jury that is to try a black defendant, it is at least permissible to conclude that a prima facie case of discrimination has been made out.

■■■ The problem here lies not with the establishment of the prima facie case but rather with the events occurring after Judge Buchanan asked the prosecutor to explain. There was no explanation, but instead of insisting on one, or concluding that the explanation was inadequate, the judge simply let the matter drop, and went on to other things.

---

**19.** *But see Smith v. State,* 294 Ark. 357, 742 S.W.2d 936 (1988), where there was a dispute as to whether any of the remaining jurors were black. The court compared this case to *Ward v. State,* 293 Ark. 88, 733 S.W.2d 728 (1987), where removing all blacks from the jury did establish a prima facie case of discrimination. The court in *Smith* held that appellant had not established the fact that striking the two black jurors had the effect of removing all blacks from the jury. Striking two, standing alone, was not enough for a prima facie case. *And see, State v. Antwine,* 743 S.W.2d 51, 66–67 (Mo.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988) (the State used three of its peremptory challenges to strike the three black members of the venire; after analyzing the reasons given for the strikes, the court found there was a failure to establish a prima facie case of discrimination).

This presents an argument against limited remand, but under the circumstances of this case, we shall order one. The prosecutor, as we have seen, initially said he did not have to justify his peremptories. That was a proper response under *Swain*. *Brice v. State*, 264 Md. 352, 366, 286 A.2d 132, 139 (1972). It was a totally wrong response under *Batson*. But then the prosecutor went on to say "[t]he fact that he [the juror] was of the same race as Mr. Trice ..." at which point he was interrupted by defense counsel. That was the end of the discussion.

The prosecutor's response that was halted in midstream might have reaffirmed the erroneous notion that a prosecutor could use peremptories to strike on account of race. On the other hand, the prosecutor might have gone on to give, or attempt to give, a racially neutral explanation. As a matter of fairness, we shall remand the case under Rule 871 to allow the State to explain its strike, if it can. *See United States v. Battle, supra*, 836 F.2d at 1085–1086 (where trial court and prosecutor mistakenly believed that *Batson* provided for permissive rather than mandatory explanation procedure, case remanded to allow explanation).

The procedure on remand will be that we have prescribed in *Stanley*, Part II, *supra*. As in *Stanley*, the trial judge must be alert to detect pretextual reasons for the challenge. The reasons given must be reviewed in light of all relevant circumstances that existed when the challenge was made. *See Parker v. State, supra*, 72 Md.App. at 618 n. 4, 531 A.2d at 1317 n. 4. The reasons given must be clear and reasonably specific. Trice will have an opportunity to respond to the State's explanation. The trial court must bear in mind that "under *Batson*, the striking of a single black juror for racial reasons violates the equal protection clause." *United States v. Battle, supra*, 836 F.2d at 1086. *And see State v. Robbins*, 319 N.C. at 493, 356 S.E.2d at 295 ("Even a single act of invidious discrimination may form the basis for an equal protection violation").

If on remand the trial court finds that the State had legitimate reasons for its peremptory challenge, Trice's

convictions will stand affirmed, as will his sentences, except those for malicious destruction. As to those, we shall shortly review them. But if the State in all honesty does not remember, or did not have any nonracial reasons for striking the only black juror, or if any reasons given by the State appear to the trial court as simply pretext in the context of the entire voir dire proceedings, then Trice's convictions must be reversed and he will be afforded a new trial.

We now explain why Trice's objection to his burglary sentence of 25 years without parole is without merit, but why his sentences for malicious destruction of property cannot stand.

## IV. TRICE'S REMAINING ISSUES

### A. The Constitutionality of § 643B(c) and 25 Years Without Parole

Trice was sentenced to 25 years without the possibility of parole, as provided by Md.Code (1987 Repl.Vol.) Art. 27, § 643B(c).[20] He now alleges that imposition of a 25–year sentence without the possibility of parole subjecting him to essentially a life sentence, predicated on a simple robbery (wallet-snatching) committed when he was barely 15 years old, with only two occasions of crime in the ensuing 23 years, would be cruel and unusual punishment in violation of the eighth amendment.

---

**20.** That section states:

(c) *Third conviction of crimes of violence.*—Any person who (1) has been convicted on two separate occasions of a crime of violence where the convictions do not arise from a single incident, and (2) has served at least one term of confinement in a correctional institution as a result of a conviction of a crime of violence, shall be sentenced, on being convicted a third time of a crime of violence, to imprisonment for the term allowed by law, but, in any event, not less than 25 years. Neither the sentence nor any part of it may be suspended, and the person shall not be eligible for parole except in accordance with the provisions of Article 31B, § 11....

To paraphrase *Rummel v. Estelle*, 445 U.S. 263, 268, 100 S.Ct. 1133, 1136, 63 L.Ed.2d 382, 387 (1980):

> First, [Trice] does not challenge the constitutionality of [Maryland's] recidivist statute as a general proposition.... Here, [Trice] attacks only the result of applying this concededly valid statute to the facts of his case.

In fact in *Bryan v. State*, 63 Md.App. 210, 492 A.2d 644, *cert. denied*, 304 Md. 296, 498 A.2d 1183 (1985), and *Teeter v. State*, 65 Md.App. 105, 499 A.2d 503 (1985), *cert. denied*, 305 Md. 245, 503 A.2d 253 (1986), the constitutionality of Art. 27, § 643B(c) was upheld under the federal and state cruel and unusual punishment proscriptions and under the due process and equal protection clauses.

Trice also does not request a proportionality review regarding the crime for which he was convicted (burglary), so we do not need to look to "(i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions," as required by *Solem v. Helm*, 463 U.S. 277, 292, 103 S.Ct. 3001, 3011, 77 L.Ed.2d 637, 650 (1983). For example, see the analysis in *State v. Davis*, 310 Md. 611, 530 A.2d 1223 (1987), where we considered the eighth amendment disproportionality argument. We held there that a life sentence without parole after a fourth housebreaking conviction did not violate the principle of proportionality embraced within the eighth amendment's prohibition against cruel and unusual punishments. *Id.* at 623–639, 530 A.2d at 1229–1237.

Instead, Trice focuses on one of his two predicate convictions, the first one. He emphasizes that he was but 15 when this occurred in 1964. He avers that minors are "traditionally held ... less responsible for their criminal acts" (Br. at 11) and that the offense "could have been little more than a wallet-snatching, elevated from theft to robbery by the slightest resistance...." *Id.* But when it enacted § 643B(c), the General Assembly did not exempt

from its stern sanctions minors convicted in criminal court.[21] Nor did it exempt from the enhanced punishment calculation convictions that took place long ago. And we are not persuaded by Trice's unsubstantiated claim that the robbery of which he was convicted might not have been a very serious offense. Like the housebreaking in *Davis,* the robbery here contained the potential of a serious threat of violence to the victim. *State v. Davis,* 310 Md. at 629, 530 A.2d at 1232.

The legislature has laid down the prerequisites for enhanced sentencing. Trice meets all those conditions. We accord substantial deference to the legislatively adopted policy. *Id. Davis* is dispositive of this issue. If, therefore, the trial court rejects Trice's *Batson* argument and declines to order a new trial, this sentence is affirmed. If it orders a new trial, of course, this sentence will fall with the conviction for which it was imposed.

B. *Section 111 and Three Years for Malicious Destruction of Property*

Trice was sentenced to three-year terms on each of two convictions for malicious destruction of property. Maryland Code (1987 Repl.Vol.), Art. 27, § 111(b) imposes a penalty of a "fine not exceeding $500 or imprisonment not exceeding 60 days or both," if someone maliciously destroys the property of another and the value of the property is less than $300. Under § 111(c), if the property has a value of $300 or more, then the penalty is a "fine not exceeding $2,500 or imprisonment not exceeding 3 years or both."

Trice argues and the State concedes that there was no proof that the property destroyed exceeded $300 in value, so the two three-year sentences are improper. The destruction was of two doors, but the testimony only established

---

**21.** Trice does not question the validity of the waiver procedures used to transfer his case to criminal court. *See Wiggins v. State,* 275 Md. 689, 344 A.2d 80 (1975). As a consequence he does not advance a *Raiford*-type argument based on an allegedly invalid waiver. *See Raiford v. State,* 296 Md. 289, 462 A.2d 1192 (1983) (invalid conviction cannot be used for purposes of enhanced punishment).

the value of the property taken in theft and ascribed no value to the doors. The State concedes that Trice's sentence could not exceed 60 days incarceration or a $500 fine or both, so we must conditionally vacate those judgments and conditionally remand for proper sentencing.

The condition involves the *Batson* limited remand. If the trial court orders no new trial on *Batson* grounds, the malicious destruction sentences stand vacated, and proper sentences may be imposed. If a new trial is ordered, those sentences, like all other sentences imposed in this case, are vacated, so that a full new trial may be had.

## V. SUMMARY

Both Stanley and Trice have established prima facie cases of purposeful discrimination in the State's use of peremptory challenges. In both cases we order Rule 871 a limited remands, without affirmance or reversal, to enable the trial courts to conduct *Batson* hearings.

At each hearing, the State is to present, if it can, honest, neutral, nonracial reasons for the challenges of each black potential juror who was stricken. Any reasons presented must be legitimate, clear and reasonably specific, as general assertions of assumed group bias or broad denials of discriminatory motives will be insufficient to overcome the defendants' prima facie cases. The reasons must be tailored to the particular facts of the case that was tried and related to the individual traits of the jurors. The defendant will be afforded the opportunity to rebut any explanations put forth by the prosecutor and to expose any justification that on its face may appear racially neutral, but is in reality a sham or pretext. The trial court must then articulate a clear ruling detailing the basis on which it was made, and explaining whether the established prima facie case of purposeful discrimination has been overcome by the State.

A new trial will be required if the State cannot produce satisfactory nondiscriminatory reasons for every peremptory challenge exercised to exclude a black juror. A new trial

will be ordered if any reasons given by the State are perceived by the trial court as only pretext and thus not satisfactorily racially neutral. A new trial will be mandated if any one of the peremptory challenges to black jurors was exercised with a discriminatory purpose, as the State will not be allowed "one free discriminatory strike." *Any* violation requires a new trial.

In the event a new trial *is* ordered for either defendant, he is to be retried on all charges, unless the State elects not to press some or all of them. If the State, however, can honestly present, to the satisfaction of the trial court, nondiscriminatory reasons for the exercise of all peremptory challenges to black jurors, a new trial will *not* be ordered and the judgments will be affirmed, except that in Trice's case, the sentences for malicious destruction will stand vacated to permit proper sentences to be imposed.

IN STANLEY V. STATE, NO. 82, SEPT. TERM, 1987, CASE REMANDED WITHOUT AFFIRMANCE OR REVERSAL TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY WITH DIRECTIONS TO THAT COURT TO CONDUCT A HEARING IN ACCORDANCE WITH THIS OPINION. COSTS IN ALL COURTS TO ABIDE THE RESULT.

IN TRICE V. STATE, NO. 107, SEPT. TERM, 1987, CASE REMANDED WITHOUT AFFIRMANCE OR REVERSAL TO THE CIRCUIT COURT FOR BALTIMORE COUNTY WITH DIRECTIONS TO CONDUCT FURTHER PROCEEDINGS IN ACCORDANCE WITH THIS OPINION. THE SENTENCE OF 25 YEARS WITHOUT PAROLE REMAINS IN EFFECT PENDING THIS HEARING. THE CONCURRENT SENTENCES OF THREE YEARS FOR MALICIOUS DESTRUCTION ARE VACATED AND THE CASE IS REMANDED FOR RESENTENCING ALSO PENDING THE OUTCOME OF THIS HEARING. COSTS IN THE CIRCUIT COURT FOR BALTIMORE COUNTY AND IN THIS COURT TO ABIDE THE RESULT.